Good morning, your honors, and may it please the court, I'm here today representing James LeGrone, who was the petitioner in the court below, and I'd like to reserve five minutes for rebuttal if I may. You may. Thank you. Your honors, this case should be remanded back to, ultimately, to the state court for a new trial in this matter, because police officers in this case violated the due process rights of Mr. LeGrone by interfering with state witnesses and causing them to provide testimony that was less than truthful at the trial in this case. The two witnesses that we've provided affidavits for in the court below, Javon or Jay Carter and Willie Pringle, both testified in the trial of this case. They have provided affidavits that say that the testimony that they provided was, A, not truthful, but more importantly than that, it was not truthful because they were threatened by police officers, which provided them with the basis... You testified all that in the trial that they were leaned on and their stories changed? I thought all that was in the record in the trial. Well, it was not. They did testify to part of it, but not the majority of it. And the problem here is that at the time of the trial, obviously, they were feeling the pressure of that intimidation itself, which is why this came out later on in the process. They testified that they had been pressured and intimidated, and they testified that they had given the police statements that were not true. Absolutely. So what they're doing now is saying, and on top of that, even the testimony that we ended up giving was still not, I guess one of them says not true and one says not exactly true, is that right? Exactly. The omissions... The whole area was known, that is, the fact they'd been pressured was known. Yes. The fact that they had changed their stories to some degree was known. And it's just that now they say that they're changing them yet again. Absolutely. So that's what we're dealing with here. But the part that has been omitted from this process is kind of a key and critical part to the entire prosecution in this case, and that is that there was this other person who had a motive for the shooting in this matter, and that was Ms. Hughes. The whole issue and the whole story of Ms. Hughes putting together a robbery of that particular home on that particular night was something that was never heard by the jury in this case, and the reason that it wasn't heard by the jury in this case was because of the conduct of the police officers in suppressing that particular evidence. Did Hughes testify? Yes. She testified, and so obviously the defense knew that she was involved. I mean, she's connected with all of these people, so it wasn't like she's the mysterious stranger in the bushes. Absolutely. But they had no reason to believe... There were actually numerous people in the house that evening, and so there was no reason to necessarily believe without hearing from Mr. Pringle and Mr. Carter, there was no reason to believe that she somehow was putting together this robbery of the home, and that's the... Were they asked anything about their relationship with her? Were they denied speaking to her or anything of that sort? I do not recall... You're talking about trial testimony? Yeah. I do not recall any trial testimony in that regard. As a matter of fact, and again, it gets to kind of an ancillary to the problem, which is that neither Mr. Pringle nor Mr. Carter were ever questioned by defense counsel prior to them being put on the stand as well, so defense counsel didn't do any investigation to determine what they would or wouldn't have said. Am I right, though, this is... It may be important, but it's peripheral in the sense that they were not in any way witnesses to the crime itself, that they were, in a sense, ways of providing either impeaching Ms. Hughes or supporting an alternative theory. Neither of them were eyewitnesses to the crime, but if you parse out the crime, and you have to look at the murder versus the robbery in this case, because when you look at the robbery, there are a lot of witnesses. When you then go to the murder in this case, the number of eyewitnesses becomes scarce. Basically Lee and maybe one other... I don't... Lee is the big one. We have Walter Lee. We don't have Hughes because she said that she went the other way as soon as shots started being fired. We have Lee's son, who was outside at the time, who also couldn't provide any evidence as to who it was. Lee is the big one. Lee is the big one. I wanted to go on about the timing here, though, because, correct me if I've got the dates wrong, but these affidavits are signed in November of 2006, and, in fact, they say that they were contacted by this Lisa Legrone earlier, and pretty much she... I mean, they may be truthful, but pretty much she provides or a lawyer provides the affidavits. They're typed the same. Language is the same. One of them even says, I received this affidavit. Yes. Petitions filed in 2009, right? Yes. So how do you get around that gap? Well, I think there are three ways to get around that gap. First, which is probably the weakest argument, which is the district court, in this case, actually went to the merits of this thing and eschewed any argument in terms of a procedural default or anything like that. But I think, more importantly, we have the fact that this court, in the 2009 case, when it granted a successive petition in this case, made specific findings that this was evidence that wasn't available earlier. And I think that that is... Earlier than... Well, there's no findings of what the earlier than was, but... We don't make findings. That was just a simple order of the Sixth Circuit, wasn't it, granting the leave to file a second or successive petition? It was, but... It's a statement. The decision of the court when it granted the leave for successive says, because the affidavits could not have been discovered previously for purposes of 2254. It's not couched in terms of that threshold procedurally going forward, but there is a finding that the affidavits could not have been discovered previously. But we know when they were discovered, because they were signed in 2006. Absolutely, but I think that we're stuck with, in my opinion, we're stuck with law of the case here. Let's try your third reason. Well, the third... This is an ancillary reason. This is a Part 2B to this issue, which is the state of Michigan in this case did have the opportunity to respond to the second or successive petition in this case and bring forth all of this information to this original panel before it made its decision that there were all these problems, and they filed a document saying we're not responding to the second or successive petition. Go back to your point on Ms. Hughes. I thought that Ms. Hughes testified in the 1992 trial and that she was asked specifically about a setup and that she said, with respect to that, I ain't never set nobody up. She was asked about that. She actually, there was this whole interplay in her testimony about, she didn't know what the word setup meant, and she thought it was something like setting up a chair or something like that. Absolutely, she was asked that information. I don't know that that equates that defense counsel knew that this was a defense because obviously he didn't further that with any other witness or make any other allegation that there was, in fact, a setup in this case, and that wasn't, if you get to the closing argument, that's not the defense that's presented at the time of trial. Yes, that question was there, but I don't think it was, I think it was merely phishing, if anything else. The third issue that I raised in my reply brief on why we get past this issue with regards to the timing is the actual innocence exception, and I raised that not, I didn't argue that as a freestanding, but I did argue it as the basis for moving forward to the merits of the case. And so we rely on that gateway, the actual innocence gateway as our, yes, as kind of our third prong to be able to get to the merits of this matter. And unless there are any other further questions, I would leave the balance of my time for the rebuttal in this case. Thank you, counsel. Thank you. Good morning.  Andrea Christensen of the Michigan Attorney General's Office appearing on behalf of Warden Thomas Burkett. The district court rejected the claims of police intimidation and the related Brady claims on the merits. However, we do submit that the claims are barred by the statute of limitations, the one-year statute of limitations, as well as the procedural default doctrine. However, either way, the court chooses to address the issues. Mr. Legrome cannot show that he's entitled to relief, so the state would ask the court to affirm the decision. Doesn't the Brady issue bother you a little bit? Frankly, Your Honor, it does not. I mean, the response is, well, the questions were asked at trial, it came out, so the government didn't have a duty to disclose. I mean, is that really the way it's supposed to work? Well, what I would say to the Brady issue, Your Honor, is with respect to both the police intimidation that they allege, as well as Sharon Hughes being the mastermind of this robbery plot, is that even if it did come out, and it did, excuse me, it did come out at trial about a setup, Your Honor pointed to that testimony, and Javon Carter and Willie Pringle both testified at length that they were pressed by police, that they felt intimidated, and that's why they gave non-truthful prior police statements. So with respect to Brady, the three prongs that need to be met by Mr. Legrome are materiality, suppression, and resulting prejudice.  None of those elements of Brady can actually be met. So at best, the content of the affidavits where both Carter and Pringle testify, or excuse me, they aver in their affidavits, that Sharon Hughes approached them and talked about setting up a robbery, with respect to that, at best, that information could have been used for impeachment value, and Brady does apply to impeachment evidence. However, here, with respect to Sharon Hughes, anything that defense counsel would have done to impeach her further would have made absolutely no difference. Defense counsel did a great job of impeaching her credibility as a witness. He discussed her drug use. He discussed how she had just woken up right before the robbery took place. He attacked her vision. There's testimony in the trial that she's actually cross-eyed. So he attacked her vision. He attacked where she was placed during the robbery, so her ability to see what actually happened, and her lapses in memory between the statement she gave to police as well as her testimony at trial. So there was significant impeachment here by defense counsel. So I would state that anything, the embellishments that Mr. Carter and Mr. Pringle made in their affidavits would have, at best, been cumulative impeachment evidence. Were there any, in thinking about Brady, were there any physical statements, i.e. pieces of paper written down, that were suppressed, that were not, or that were allegedly suppressed, or was it simply that what they now say was suppressed was conversations with police? Two things to that, Your Honor. They say that their general conversations with the police were suppressed as well. However, there was one statement by Javon Carter who said that the police actually physically tore up his first statement because they didn't buy it, and they threatened to put him in lockup if he didn't tell the real story. That's what he stated in it. Oh, I apologize. That's an allegation, although at the moment it's not like the usual Brady claim where you come forward with a piece of paper that was in the police file. Correct. That's correct. However, about tearing up the first statement, Mr. Carter testified to that at trial. He said the police tore up my first statement. So that can be found on page ID 486 of the trial record. So he did testify to that at trial, and it could have been, and actually it was explored because he said everything I made in that first statement was the truth. So did some policeman testify disputing that? Actually, my review of the record had very little to do with their actual interview with Javon Carter and Willie Pringle. So there was very little with respect to the officers. But they certainly could have raised a Brady claim at that point if they say that this statement existed and you destroyed it and didn't provide it. I suppose they could, Your Honor. However, we do have, I believe it's United States v. Ward, that even if the evidence comes out mid-trial that Brady doesn't apply because it can be used actually at trial. So it's not a complete suppression. If they either tore up or still have the statement and haven't produced it, it would still be a Brady violation, wouldn't it, if it really happened? If the statement existed. Correct. Yes. So what quote came out was the story but not the physical piece of paper or its destruction, assuming that that happened. Absolutely right, Your Honor. I would briefly like to address the general police intimidation claim, if I could. The test that he has to, that Mr. Legrone has to meet in order to be entitled to relief on that claim is that Carter and Pringle were under such duress by police that it affected their decision to testify and it affected the content of their testimony. And that standard has not been met here. Both men testified openly about how the police intimidated them, threw them in lockup until they changed their testimonies, and so finally they acquiesced and said something to the effect that would implicate Legrone, which frankly is questionable, and that they were pressured into giving these false statements. But when you examine the trial record and you actually read what they testified to, it didn't result from interference from police because they completely undercut what the police, if they had leaned on them, wanted them to say. They said, no, everything I testified to, or excuse me, everything that I said in my police statement was just not true. I'm telling you the truth now at trial. So that test can't be met because they completely renounced those statements as just a pack of police-induced lies. So that standard can't be met. And in any event, we would submit that it's harmless simply because their trial testimony, when they said up and down, this is true. Legrone had nothing to do with this. And neither of them can say that they witnessed the shooting, as Your Honor Judge Boggs pointed out, because they didn't. One was a street away and one was nowhere near the scene of the shooting. So they can't say whether or not, or excuse me, they can't speak to what actually happened in the house. And secondly, Carter and Pringle's testimony aside, there was other significant evidence that implicated Mr. Legrone. And the key part, as Your Honor again pointed out, was Walter Lee. He was the one who had the five-minute discussion with Mr. Legrone in the house about Legrone wanting to sell heroin out of his house, along with a lineup of other people that were selling drugs out of the home. So he was the one that spoke to him. He was the one who had a gun put to his head. He's the one who watched his friends being robbed. And then he also watched Mr. Legrone chase his nephew off the steps, and then there were shots fired. So his eyewitness testimony is essential to this case. Javon Carter and Willie Pringle have very little import here. Did Lee testify to seeing the actual shooting? I'm sorry, who? Did Lee testify to seeing the actual shooting? No, Your Honor. If I read the trial testimony correctly, Walter Lee said that as his nephew was at the door and Mr. Lee was speaking with him, Mr. Legrone was hiding behind the door, but when he couldn't get Butch to come inside, Butch the nephew, when Walter Lee couldn't get him to come inside, Legrone came out from behind the door. Butch apparently saw the gun and booked off the porch. And that's when Legrone followed him, and all of a sudden Lee heard shots. I don't think he said he actually saw the shooting, but I'll rely on the record for that. Pretty contemporaneous. It was very contemporaneous. Edited out that way. And I believe, as my friend on the other side said, that Robert Lee, who is Walter Lee's son, was in a car out front. He said that he heard running down the porch and he heard gunshots right afterwards. So that's consistent with Walter Lee's testimony. So with respect to both claims, the standards of both claims, Brady and police intimidation, neither of them are met here. And even if they were, any error is harmless based on the very strong testimony of Walter Lee. And just to back up, the cornerstones of the issues here are with respect to these affidavits. And under what your Honor talked about, the Schlepp standard, requires very significant evidence to overcome procedural defaults such as, or procedural bars such as the statute of limitations. This is a 1991 murder. He had three opportunities at the state court, and every single time he presented different evidence that was newly discovered. So here, the affidavits that were signed 15 years after the conviction, we find incredibly suspect, especially considering the fact that the premise upon which those affidavits are based were actually discussed at trial. I am happy to address any further questions, but if there are none, we request that the court affirm. Thank you. Mr. Baird, you have five minutes for rebuttal. Thank you. Just a couple of points, your Honor. First, with regards to evaluating this testimony in light of the effective or non-effective cross-examination of Hughes at the trial in this case. Whether or not there was effective cross-examination by defense counsel is not the standard that should be used, because you have to look at what was the effect of the suppressed evidence, what effect would that have had on the trial in this case. I think there's a recent case from this court called Tavera, which is a Brady case, and as I recall in that case, the court found that there was sufficient evidence to convict, but still overturned based upon the Brady violation because of the effect that it could have had on the case. In this case, the defense was it wasn't me, that I wasn't there, Mr. Grom wasn't there, it wasn't him. So to be able to then put before the jury, not only wasn't I there, it wasn't me, but Ms. Hughes not only had a plan to have this go down, but she planned this with these other individuals and had discussions about it right before leading up to it, would have been significant to the jury in this case. Did the affidavits corroborate the alibi story? I mean, how did they do that? Well, yeah, actually both Pringle and Javon Carter's affidavits talk about the discussion with Hughes and that she was going to set up a robbery. That doesn't push the alibi that he wasn't there at all. It does not push up, no. And the alibi he wasn't there at all really isn't fleshed out in the record pre or post trial or anywhere since. It isn't very strong. But it gets a lot stronger with this additional evidence that somebody else had the means, motive, and opportunity to commit this robbery. And if the court has no further questions, we would submit. Thank you. Thank you, counsel. The case will be submitted. The remaining cases will be submitted on briefs, and you may adjourn court. Thank you.